UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 16-10233-RGS

UNITED STATES OF AMERICA

v.

DONNA M. ACKERLY

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR A JUDGMENT OF ACQUITTAL,
OR IN THE ALTERNATIVE, FOR A NEW TRIAL

August 30, 2019

STEARNS, D.J.

"*Then call them to our presence: face to face and frowning brow to brow, ourselves will hear the accuser and the accused freely speak.*"[1]

This case raises the difficult issue of whether a violation of a defendant's Sixth Amendment right of confrontation, "invited" or not, should be deemed harmless beyond a reasonable doubt. Gov't's Mem. (Dkt # 514) at 19. Because I conclude that in the circumstances of this case it cannot, a new trial must be ordered. *See United States v. Earle*, 488 F.3d 537, 542 (1st Cir. 2007).

On January 15, 2019, after a seven-day jury trial, defendant Donna M. Ackerly was convicted of conspiring with three coworkers, Charles Garske,

---

[1] WILLIAM SHAKESPEARE, RICHARD II, act I, sc. 1, cited in *Lilly v. Virginia*, 527 U.S. 116, 141 (1999) (Breyer, J., concurring).

Richard Gottcent, and Michael Sedlak, and a fourth individual named Brian Zentmyer (also known as Brian Bennett) to commit wire fraud and honest services fraud. She was also convicted of two substantive counts of wire fraud involving clients of her employer Georgeson, a proxy solicitation firm.

Ackerly, Garske, and Gottcent were senior managing directors (Account Executives) in Georgeson's Institutional Services Group (ISG). Sedlak worked as a researcher at ISG and reported directly to Gottcent. Zentmyer was a mid-level employee of Institutional Shareholders Services (ISS), a proxy voting advisory firm. In his position at ISS, Zentmyer had access to confidential information, including the tallies of proxy votes cast by ISS's institutional shareholder clients.

The case against Ackerly and the codefendants was premised on an alleged scheme to suborn the "honest services" of Zentmyer by inducing him to disclose ISS's confidential information in exchange for bribes. The "bribes" paid to Zentmyer consisted of tickets to sporting events and concerts totaling some $14,000 over the almost five-year life of the conspiracy. The wire fraud counts against Ackerly involved two instances in which she allegedly billed a portion of the costs of the tickets to Georgeson clients without their authorization.

This was the second jury trial Ackerly faced. The first ended in a mistrial after she and the government refused to stipulate to a jury of eleven when, immediately prior to closing statements, the twelfth juror was excused because of a medical emergency. *See* Fed. R. Crim. P. 23; Dkt # 404. Now before the court are Ackerly's post-trial motions seeking a judgment of acquittal, *see* Fed. R. Crim. P. 29, or in the alternative, a new trial, *see* Fed. R. Crim. P. 33.

**The Legal Standard**

A district court's power to order a new trial pursuant to Rule 33 is broader than its power to grant a motion for acquittal. *United States* v. *Rothrock,* 806 F.2d 318, 321 (1st Cir. 1986). The court may consider both the weight of the evidence and the credibility of the witnesses in deciding a motion for a new trial. *Id.* However, "[t]he remedy of a new trial is rarely used; it is warranted 'only where there would be a miscarriage of justice' or 'where the evidence preponderates heavily against the verdict.'" *United States* v. *Andrade,* 94 F.3d 9, 14 (1st Cir. 1996), quoting *United States* v. *Indelicato,* 611 F.2d 376, 387 (1st Cir. 1979).

**Background**

The Confrontation Clause violation at issue occurred during the redirect examination of Keith Haynes, a former Account Executive at

Georgeson who had previously pled guilty.  To set the context, the government had listed Zentmyer, who had been a key witness at the prior trial, on its witness list, but did not ultimately call him.  On cross-examination, Ackerly's lawyer, Michael Kendall, had asked Haynes whether the government had told him prior to his guilty plea that Zentmyer had entered into a cooperation agreement.  The government, in its post-trial Memorandum, states that it interpreted Kendall's line of questioning as implying "that the government withheld from Haynes the fact that Zentmyer did not commit a crime," and that the government believed him.  Gov't's Mem. at 17, 18.   To disabuse the jury of any such inference, AUSA Frank asked Haynes the following:[2]

> Q. You were asked what you were aware of at the time you chose to plead guilty, correct?
>
> A. Correct.
>
> Q. You were aware –  Mr. Kendall asked you about Brian Zentmyer's cooperation agreement?
>
> A. About –
>
> Q. Do you recall being asked whether Brian Zentmyer was cooperating with the government?

---

[2] The government in its Memorandum essentially concedes the constitutional violation but argues that the revelation of Zentmyer's guilty plea to the conspiracy "was arguably invited" by Kendall.  Gov't's Mem. at 19.  It also suggests that "the better course may have been for the government to decline the defendant's invitation."  *Id.*

4

>A. Yes.
>
>Q. You were aware at the time you pled guilty that Mr. Zentmyer had also pled guilty to being involved in a conspiracy –
>
>MR. KENDALL: Objection.
>
>Q. – to steal confidential ISS information in exchange for bribes?
>
>THE COURT: I'm going to sustain the objection. Jurors, the admitted guilt of others really is not relevant to this specific defendant's guilt or non-guilt, as the case may be.

Tr. Day 3 at 67:19-68:12.

**The Confrontation Clause**

The Confrontation Clause of the Sixth Amendment guarantees that an accused in a criminal prosecution "shall enjoy the right . . . to be confronted with the witnesses against him." The origins of the Confrontation Clause have been described by one scholar as "murky," Randolph N. Jonakait, *The Origins of the Confrontation Clause: An Alternative History*, 27 Rutgers L.J. 77, 77 (1995), although the fundamental concept figured prominently in Roman law.[3] The consensus view with respect to its inclusion in the U.S. Constitution – espoused by Justice Scalia in *Crawford v. Washington*, 541

---

[3] "It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face to face, and have license to answer for himself concerning the crime laid against him." *Acts of the Apostles* 25:16 (King James), cited in *Coy v. Iowa*, 487 U.S. 1012, 1015-1016 (1988).

5

U.S. 36 (2004) – is that the Confrontation Clause was intended to suppress the sixteenth and seventeenth century English practice of trial through *ex parte* affidavits.[4]

Whatever the intention of the Framers, the Confrontation Clause, with a notable 1899 exception that I will return to, lay largely dormant until, in the waning days of the Warren Court, *Bruton v. United States*, 391 U.S. 123 (1968), was decided.  The reason lay in the lulling proposition that the rule against hearsay and the Confrontation Clause had been shown by almost a hundred years of jurisprudence to have been "'generally designed to protect similar values' . . . and 'stem[med] from the same roots.'"  *White v. Illinois*, 502 U.S. 346, 353 (1992) (citations omitted).  In other words, the protections of the rules of evidence largely rendered the Confrontation Clause superfluous.

This somnolent view, however, suffered a sea change in *Bruton*.  In that seminal case, the Court held that the admission at a joint trial of a nontestifying accomplice's extrajudicial confession "powerfully" incriminating a codefendant by name violated the Sixth Amendment confrontation right.  391 U.S. at 135-136.  According to the majority, led by

---

[4] Justice Scalia took particular umbrage with the 1603 treason trial of Sir Walter Raleigh.  *See Crawford*, 541 U.S. at 44.

Justice Brennan, a *Bruton* error posed too great a risk to "the practical and human limitations of the jury system" to be cured by limiting instructions. *Id.*; *but see Richardson v. Marsh*, 481 U.S. 200, 208-209 (1987) (noting that where the "contextual implication" is not very strong, "the judge's [limiting] instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place").

The *Crawford* decision, authored by Justice Scalia, constituted, what some would (and did) argue, a radical extension of the holding of *Bruton* from the inculpatory testimonial statements of nontestifying codefendants to the incriminating testimonial statements of nontestifying witnesses generally. *Crawford* overturned a state evidentiary decision upholding the admission at trial of a nontestifying wife's "trustworthy" statement to police implicating her husband in an assault. 541 U.S. at 40. In doing so, Justice Scalia heaped scorn on the "malleable" "indicia of reliability" test of *Ohio v. Roberts*, 448 U.S. 56 (1980), which in his view, had largely neutered the protections of the hearsay rule by riddling it with exceptions. *Crawford*, 541 U.S. at 60.

> Where testimonial statements are involved, we do not think that the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." . . . [The Confrontation Clause] is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a

particular manner: by testing in the crucible of cross-examination.

*Id.* at 61.

While acknowledging that the Court was unprepared "to articulate a comprehensive definition [of testimonial evidence] in this case," *id.* at 68 n.10, Justice Scalia did identify, among other examples of statements that fell within the "core class" of those to which the Confrontation Clause was directed, "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Id.* at 51-52. Included in the category of confessions are guilty pleas as evidenced by the Court's unearthing of a century-old case, *Kirby v. United States*, 174 U.S. 47 (1899), cited by both Justice Scalia and by Chief Justice Rehnquist in his concurring opinion. As more fully described by the Court in *Melendez-Diaz v. Massachusetts*,

> [i]n *Kirby v. United States*, the Court considered Kirby's conviction for receiving stolen property, the evidence for which consisted, in part, of the records of conviction of three individuals who were found guilty of stealing the relevant property. Though this evidence proved only that the property was stolen, and not that Kirby received it, the Court nevertheless ruled that admission of the records violated Kirby's rights under the Confrontation Clause.

557 U.S. 305, 314 (2009) (citations omitted); *see also Commonwealth v. Palermo*, 482 Mass. 620, 627-628 (2019) (vacating defendant's conviction

after the trial judge erroneously permitted the guilty plea of a nontestifying codefendant to be offered to rebut the defendant's testimony, rejecting a harmless error argument, and quoting *Kirby* at length).

The fundamental point is that a guilty plea is no less a testimonial confession than the codefendant's incriminating statement offered in *Bruton*. And, no less than in *Bruton*, the Confrontation Clause is violated when evidence of a guilty plea of a nontestifying codefendant is offered for its truth, here as to the existence of the conspiracy. In this circumstance, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 68. As the court later attempted to explain to the jury in this case, *see* Tr. Day 7 at 12:11-24, there are many reasons personal to a defendant why he might choose to enter a guilty plea. Here, because Zentmyer was not called as a witness, that is, he was "unavailable," Ackerly was deprived of the opportunity on cross-examination to explore those reasons. I find it telling that in *Crawford*, in criticizing the *Roberts* test, Justice Scalia lists as examples of its failings no fewer than six circuit cases in which guilty pleas had been erroneously admitted to prove the fact of a conspiracy.

> The unpardonable vice of the *Roberts* test, however, is not its unpredictability, but its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude. Despite the plurality's speculation in *Lilly*, 527

> U.S. at 137, that it was "highly unlikely" that accomplice confessions implicating the accused could survive *Roberts*, courts continue routinely to admit them. . . . See *United States* v. *Aguilar*, 295 F. 3d 1018, 1021-1023 (9th Cir. 2002) (plea allocution showing existence of a conspiracy); *United States* v. *Centracchio*, 265 F. 3d 518, 527-530 (7th Cir. 2001) (same); *United States* v. *Dolah*, 245 F. 3d 98, 104-105 (2nd Cir. 2001) (same); *United States* v. *Petrillo*, 237 F. 3d 119, 122-123 (2nd Cir. 2000) (same); *United States* v. *Moskowitz*, 215 F. 3d 265, 268-269 (2nd Cir. 2000) (same); *United States* v. *Gallego*, 191 F. 3d 156, 166-168 (2nd Cir. 1999) (same) . . . .

541 U.S. at 63-64.

**Harmless Error**

A constitutional violation having occurred, the court "must order a new trial unless the government has shown that any error was 'harmless' beyond a reasonable doubt." *Earle*, 488 F.3d at 542 (1st Cir. 2007). In evaluating harmlessness, the court considers several factors, "including the importance of the challenged statement in the prosecution's case, whether the statement was cumulative, the presence or absence of evidence corroborating or contradicting the statement on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case." *Id.* at 546.

The government contends that its reference to Zentmyer's guilty plea was a "one-off" blunder, and that the court's *sua sponte* limiting instruction

cured the error.[5] While a court will ordinarily presume that juries follow instructions, that "presumption may be rebutted 'on a sufficient showing that the offending testimony reasonably could not have been ignored and that serious prejudice likely resulted.'" *United States v. Gonzalez-Vazquez*, 219 F.3d 37, 48 (1st Cir. 2000), quoting *United States v. Rullan-Rivera*, 60 F.3d 16, 18 (1st Cir. 1995). And as the Supreme Court recognized in *Bruton*, certain extrajudicial statements can be "powerfully incriminating" and "devastating" to the defendant even if a jury is instructed not to consider them. 391 U.S. at 135-136; *see also United States v. Cabrera-Rivera*, 583 F.3d 26, 37 (1st Cir. 2009) (same).

The pivotal issue here is whether I can find beyond a reasonable doubt that the jury would not have been influenced by being improperly informed of the fact that Zentmyer had pled guilty to the very conspiracy for which Ackerly was being tried. This, to my mind, depends on two considerations: the importance of Zentmyer's guilt to the government's case, and apart from

---

[5] As noted previously, after sustaining Kendall's objection, the court instructed the jury that "the admitted guilt of others really is not relevant to this specific defendant's guilty or non-guilt, as the case may be." Tr. Day 3 at 68:9-12. The government also argues that the court's jury instructions at the close of the trial cured any error. *See* Tr. Day 7 at 12:14-17 ("The fact that [Haynes] or anyone else entered a guilty plea is not a factor that you may consider in assessing the guilt or innocence of Ms. Ackerly.").

the erroneous injection of the plea into the trial, the overall strength of the case against Ackerly.

The centrality of Zentmyer's guilt to the government's theory of the case was made apparent to the jury from the outset. In the first minute of AUSA Rosen's opening statement, Zentmyer was introduced to the jurors as Georgeson's and Ackerly's "secret advantage, . . . . [the] inside source who was secretly telling them how shareholders were voting." Tr. Day 1 at 17:22-25. AUSA Rosen continued:

> You will learn that Georgeson's source, a man named Brian Zentmyer, now named Brian Bennett, secretly passed information about how ISS's clients were voting to one of Ackerly's colleagues at Georgeson, Michael Sedlak, and Sedlak passed that information on to Donna Ackerly and others.
>
> So why did Zentmyer do it? He did it in exchange for tickets. Not just any tickets, but tickets to high-end concerts and sporting events, like opening day at Fenway to see the Red Sox play the Yankees, or expensive seats to see the Celtics play the Miami Heat in TD Garden in the playoffs. About $14,000 worth of tickets, tickets Sedlak went out and bought specifically for Zentmyer when Zentmyer wanted them. In exchange, Zentmyer provided the confidential voting information.
>
> That was the deal, and that's a crime. It's a form of bribery.
>
> You will learn that Donna Ackerly knew about that scheme and participated in it. She used the confidential information Zentmyer provided, and she secretly passed off part of the cost of those bribes to her own clients. But when she did, she misled her clients by disguising the cost of the bribes on her client invoices. She falsely called them things like "travel expenses, courier services" or "FedEx charges." So clients would think they were

legitimate expenses and they would pay for them. That, too, is a crime. It's also fraud.

There's nothing wrong with working hard and being aggressive in business. But Donna Ackerly and her colleagues crossed the line. They obtained confidential voting information by bribing Brian Zentmyer, and they falsely billed their clients for the cost these bribes, and that's why we're here today.

*Id.* at 18:3-19:10.

The evidence offered at trial implicating Ackerly in the conspiracy was, in the view most charitable to the government, thin. Ackerly scarcely figures in the forty-odd conspiratorial overt acts set out in the indictment. Specifically, in April of 2008, Ackerly is alleged to have questioned a $5,000 travel expense billed by Sedlak to a Florida-based client as seemingly high, but then approved it when the billing department noted that the sum included "tickets for Brian [Zentmyer]." Indictment ¶¶ 29-31, Second, in May of 2010, Ackerly is alleged to have approved an invoice to a Bermuda-based client that under the entry "travel expenses" included a partial reimbursement to Sedlak for sports tickets he had purchased for Zentmyer. *Id.* ¶¶ 44-46.[6]

---

[6] The first of the overt acts appears to be on an April of 2008 email exchange between Ackerly and Georgeson billing clerk, Beatrice Rivera, over what proved to be a $515 mischarge. In the exchange, Rivera stated that the charge reflected "tickets for Brian." Tr. Day 4 at 95:9-97:21; Tr. Ex. 232. The second overt act may refer to a March of 2010 expense report submitted by

13

Haynes, the government's principal trial witness, testified that in the many years that he had worked with Ackerly at Georgeson, he had never discussed a contact at ISS with her, had never copied her on an email seeking information from Sedlak (Zentmyer's handler), nor had he ever discussed with her the billing of sports or concert tickets for Zentmyer. Tr. Day 2 at 8:2-11, 61:4-62:9; Tr. Day 3 at 20:4-21. The most that Haynes could say came in this exchange with Kendall (Ackerly's lawyer) on cross-examination.

> Q. As far as you know, you have no idea if Donna [Ackerly] ever knew that information came from ISS because you never discussed it with her, as you testified yesterday?
>
> A. No. . . . I'm not going to say that I've had any direct conversation with Donna about how she went about doing her job. But my sense was that at least at the [Account Executive] level most, if not all, of us have had some level of direction and knowledge of what [Sedlak] was doing with respect to ISS.

Tr. Day 3 at 20:4-7, 17-21.

The closest approximation of direct evidence came from the testimony of Lauren Haber who worked at Georgeson from 2007 to 2012 as an administrative assistant. For six or seven months, she gave secretarial assistance to Ackerly with whom she had a supportive relationship. She was also close to Sedlak whom she regarded as a confidant and for whom she

---

Sedlak, which listed a billing of $200 for a "Gift for Brian" to one of Ackerly's clients. Tr. Day 4 at 139:8-140:6; Tr. Ex. 138.

14

helped prepare and file expense reports. According to Haber, Sedlak's reports almost always included receipts for tickets that he had purchased as "gifts" for Zentmyer. Tr. Day 3 at 134:13-23, 139:9-17. Among Haber's tasks was to obtain the approval of the Account Executive to whose client the tickets were being billed. Among them was Ackerly, who Haber testified had never refused a request to bill a portion of a ticket price to one of her clients, although on one occasion she objected to the amount as "too much," and told Haber that "we need to split it up." *Id.* at 130:15-20. When asked whether she ever specifically asked Ackerly to approve bills for tickets that Sedlak purchased for Zentmyer, she replied:

> A. Yes.
>
> Q. When you did that, what, if anything did you say to her?
>
> A. I said either, I have tickets, or, Michael needs a work order number or I mentioned Brian's name. . . . [T]ickets were understood to be for Brian.

*Id.* at 129:10-15, 130:5-6.

Over the next twenty-seven pages of the transcript, AUSA Frank questioned Haber closely about eight expense reports she had prepared or submitted for Sedlak. The only testimony implicating Ackerly was with respect to Exhibit 117, a Sedlak expense report that billed half of the cost of Washington Nationals tickets to an Ackerly client; Exhibit 138, which also

15

referenced a client of Ackerly's to whom Yankees and Red Sox tickets had been billed; and Exhibit 146, which reflected a partial billing to an Ackerly client for Miami Heat and Boston Celtics tickets. Although the eight expense reports were, according to Haber, variously approved by Gottcent, Garske, Haynes, and Kellen Carson (not named as a defendant), only in the instance of Exhibit 117 did Haber testify to any direct conversation with Ackerly.

Finally, the government relied on emails (some eighteen in number) sent by Sedlak over the years to Ackerly (either directly or on which she was copied) referring to proxy voting information that he had obtained from ISS, as well as one email in which Ackerly asked Sedlak to obtain voting information from ISS. The impact of these emails was diluted, however, by Haynes's testimony that it was common practice in the industry to solicit proxy voting information from a wide variety of sources, including the institutional investors themselves, and that in many cases voting information was freely offered by the many contacts among institutional shareholders that Georgeson's account executives cultivated.[7]

---

[7] Haynes also testified that the giving of tickets to sporting and other events to clients was a common industry practice and that Georgeson maintained an inventory of tickets as "part of relationship building, you know, improving contact with clients or advisors." Tr. Day 2 at 41:21-22.

**Conclusion**

Considering the relevant factors, I cannot say beyond a reasonable doubt that placing Zentmyer's guilty plea before the jury had no influence on the outcome. His guilty plea was not cumulative of other evidence in the proper sense of the term[8] – the only plea the jury was made aware of was that of Haynes who also admitted in his testimony that he had falsely billed Georgeson for $8,400 of his personal expenses and had twice attempted to embezzle $150,000 from Georgeson by creating a fake call center. The jury might have readily concluded that Haynes had every incentive to take the government's offer to plead to the one charge.[9] Nor was tying Haynes to the conspiracy an overriding objective of the prosecution. The centerpiece of the prosecution was Zentmyer, and the goal was to tie Ackerly to him and his

---

[8] The cumulative evidence rule holds harmless the admission or exclusion of evidence that is repetitious or duplicative of other evidence involving the same matter. "[T]o be truly cumulative, the evidence must be of the 'same kind tending to prove the same point.'" W. Dudley McCarter, *The Cumulative Evidence Rule and Harmless Error*, 40 Mo. L. Rev. 79, 82 (1975). An example Professor McCarter gives is where photographs of an injury are admitted but slides of the same injury are improperly excluded. The cumulative evidence rule should not be confused with the strength of the evidence test, which is a separate consideration.

[9] Haynes pled guilty to an information charging conspiracy to commit wire fraud and honest services fraud. The plea agreement, which was in evidence (Exhibit 272), indicates that the government had agreed not to charge Haynes for the fraudulently billed personal expenses or the attempted $150,000 embezzlements.

crimes. The fact that Zentmyer had pled guilty to the very conspiracy with which Ackerly was charged could not have helped but shore up the jury's confidence in the prosecution's theory of the case, at least insofar as it concerned Ackerly, the only defendant on trial. Had AUSA Frank stopped at the fact of a guilty plea when Kendall objected, there might be some traction to a harmless error argument, but he persisted in adding the additional detail that the object of the conspiracy was "to steal confidential ISS information in exchange for bribes." In other words, the jury was informed that Zentmyer had pled guilty to the very crime that the government alleged Ackerly had conspired with him to commit. As the prior analysis of the evidence demonstrates, the case against Ackerly was hardly overwhelming, and it would be wrong to say that a reasonable jury could have arrived at no other verdict than one of guilty. This is not to say that the jury might not well have convicted Ackerly even had the constitutional violation not occurred, but I am not "firmly convinced"[10] that such would have been the case. Zentmyer's plea was a strong brick in an otherwise rickety wall. Finally, I cannot say with the requisite certainty that my improvised and cursory curative instruction was sufficiently firm to have offset the "powerfully incriminating" impact of the plea. Consequently, a new trial is warranted.

---

[10] *Victor v. Nebraska*, 511 U.S. 1, 27 (1994) (Ginsburg, J., concurring).

**ORDER**

For the foregoing reasons, the jury's verdict is vacated and Ackerly's motion for a new trial is <u>GRANTED</u>.

                       SO ORDERED.

                       <u>/s/ Richard G. Stearns_____</u>
                       UNITED STATES DISTRICT JUDGE