UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 16-10233-RGS

UNITED STATES OF AMERICA

v.

DONNA M. ACKERLY

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL
AND MOTION TO RECONSIDER *PETROZZIELLO* RULING

April 25, 2022

STEARNS, D.J.

This is third time defendant Donna Ackerly has faced trial on this indictment charging conspiracy and wire fraud.    The first trial was aborted when on the final day of trial Ackerly refused to consent to a jury of eleven after medical emergencies led to the excusal of three jurors, including the two alternates.    The second trial ended with the jury finding Ackerly guilty on all counts.    The court, however, allowed Ackerly's motion for a new trial based on government misconduct, a decision affirmed by the Court of Appeals.    *See United States v. Ackerly*, 981 F.3d 70 (1st Cir. 2020).    A third trial is scheduled for July 12, 2022, in anticipation of which Ackerly has filed the pending motions.    The government has filed oppositions to both motions.

Ackerly is charged in Count 1 of the Indictment for her participation in

a conspiracy formed with three distinct objects: (1) to defraud the victim, Institutional Shareholders Services (ISS), of confidential information, namely the voting intentions of its clients with respect to shareholder proposals; (2) to defraud ISS of the honest services of its compromised employee, Brian Zentmyer; and (3) to defraud clients of Ackerly's employer (Georgeson) of money by falsely billing to them the costs of the bribes paid to Zentmyer.  *See* 18 U.S.C. § 1349.  Count 2 of the Indictment charges Ackerly with a substantive act of wire fraud involving the false billing of basketball tickets given to Zentmyer; Count 6 charges Ackerly with an instance of wire fraud involving the suborning of Zentmyer's honest services. *See* 18 U.S.C. § 1343.

In her main argument, Ackerly insists that a reasonable jury could not have found her guilty of wire fraud as the non-public proxy voting information obtained from Zentmyer does not constitute "property" within the meaning of the statute. [1]   The premise of the argument is "that confidential information is not property unless it has economic value in the hands of the wire fraud victim," Def.'s Mem. (Dkt # 602) at 1, in this case ISS. In Ackerly's view, ISS is nothing more than a "pipeline" through which its institutional clients "efficiently" deliver their shareholder proxy ballot votes

---

[1] Ackerly also makes a sufficiency of the evidence argument that as a less than fully informed member of the alleged conspiracy she would have had no reason "to question the propriety of the [inside] information her team was receiving."  *Id.* at 2.

to a tabulating company, and as such, ISS had no economic use for the information, in the sense that it could not be commoditized into a saleable good.

I recognize that the meaning of the term "property" for purposes of wire fraud is undergoing a metaphysical reexamination, as the government has attempted to adapt the definition to behaviors and transactions in a transformative economy that do not fit comfortably into the common-law world of tangible widgets and peppercorns.   At present, *Kelly v. United States*, 140 S. Ct. 1565 (2020), and *Cleveland v. United States*, 531 U.S. 12 (2000), which refused to recognize the exercise of regulatory interests, even when abused as appropriations of property, represent the outer rim of the inquiry. [2]   The seeds of doubt were planted by the Supreme Court in *McNally v. United States*, 483 U.S. 350 (1987), which held that the mail (and wire) fraud statutes did not touch upon intangible rights divorced from traditional concepts of money and property.   But in *Carpenter v. United States*, 484 U.S. 19 (1987), the Court quickly clarified that *McNally* did not limit the scope of the mail and wire fraud statutes to include only tangible as

---

[2] The new battleground is apparently over the illicit sale of access to privileges, such as admissions to elite universities – the subject matter of the so-called "Varsity Blues" prosecutions which is now being challenged in the First Circuit Court of Appeals.   *See United States v. McGlashan* (1st Cir. No. 21-1421).   The court had suggested delaying this decision until the *McGlashan* decision is rendered by the Court of Appeals, *see* Dkt # 612, but neither Ackerly nor the government expressed any enthusiasm for the suggestion.   *See* Dkts # 613, # 614.

opposed to intangible property rights.   *Id.* at 25.   Unless and until the First Circuit or the Supreme Court say otherwise, *Carpenter* is controlling in this case.

*Carpenter* involved the unauthorized advance access to an influential Wall Street Journal business column containing confidential information "gathered at the cost of enterprise, organization, skill, labor, and money." *Id.* at 26.   The issue was not that the information in the column was to be kept a closely held secret, rather it was the loss of the right to control the timing and manner of its publication that did harm to the newspaper and, inferentially, to its ability to gather and be entrusted with such information in the future.

The circumstances for ISS were no different than those of the Wall Street Journal.   ISS was not only a simple conduit (the mere bike messenger that Ackerly posits, Dkt # 608 at 3) between its clients and Broadridge (the tabulator), but instead an aggregator of proxy votes cast by over 1,700 clients in the tens, if not hundreds, of millions of shares.   As the testimony at trial made clear, institutional clients relied on ISS to provide a valuable service in performing the cumbersome administrative task of accurately compiling and relaying voting instructions to the recipient public companies.   Clients considered the information to be confidential and expected ISS to safeguard it accordingly.   ISS also understood that breach of this expectation of confidentiality, express or implied, had the potential of doing significant

injury to its business model and its ability to function as an ongoing enterprise.    And it took appropriate steps internally to deter the unauthorized disclosure of the secrets of its proxy voting vault by employees such as Zentmyer.[3]

Ackerly argues with some superficial plausibility that providing a service, whatever value it might have to a customer, cannot be reduced to property in the tangible or intangible form required by the wire fraud statute.[4]   This contention, however, lands wide of its target.   What is at stake for victims like ISS is not a property interest in the service itself, but rather the ability to continue to provide it, which in turn depends on possession of the confidential information entrusted to it by clients.   And that possession depends in no small measure on protecting the information

---

[3] The relevant testimony is fully (and accurately) set out in the government's Opposition (Dkt # 605) at 9-13 and need only be briefly summarized here.

[4] I say superficial because a service can, of course, be monetized, which is one of the universally recognized attributes of property.   A quick answer to Ackerly's related argument that the proxy voting information at issue had no actual economic value because ISS did not sell it piecemeal on the market, Dkt # 602 at 6, 9, Dkt # 608 at 2, is to ask the question why, if that is true, Ackerly and her codefendants were willing to pay Zentmyer to provide access to it.   Moreover, there is no requirement that an aggregator of confidential information be in the business of selling it as a "stock in trade," *id.* at 8, to be able to claim its protection as property.   *See Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 250 (1905) (Holmes, J.).

from premature and unauthorized disclosure.[5]

The court's instructions to the jury in Ackerly's trial on the issue of confidential information as property were based on *Carpenter* as follows.

> In the context of this case, "property," in addition to money belonging to Georgeson's clients, also includes information of economic value in the control of ISS that the Indictment alleges was nonpublic and held by ISS in confidence.

> "Confidential," as the term is used in the Indictment, means information of a private nature that is entrusted to a third party, here ISS, with the expectation that it will be kept secret. Information that is in the public domain cannot be deemed confidential even if a party characterizes it as such.  "Public domain" is a legal term of art, but it refers to information that is generally known to the public at large or to people in a trade or business, or knowledge that could be obtained by an interested person with reasonable ease from information publicly available. One obvious measure of whether a party truly regards information as confidential is the extent to which it takes diligent precautions to safeguard the information from inadvertent dissemination or improper use by its employees or others, in among other ways by enforcing internal employee protocols and contractual restrictions.

> Trial Tr. (Day 7 Dkt # 510) at 21-22.

---

[5] Although a decision on remand has yet to be issued by the Second Circuit in *United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019), *vacated and remanded*, 141 S. Ct. 1040 (2021), a case cited as instructive by Ackerly, the distinction between a government entity like the Centers for Medicare & Medicaid Services and a commercial enterprise like ISS could not be more obvious.

I believe that those instructions remain a correct statement of the law and, barring an intervening decision by higher authority to the contrary, I intend to give them again at Ackerly's retrial.[6]

Ackerly's remaining claims can be dealt with in summary fashion.

(1)   Judgment of Acquittal based on an insufficiency of evidence

In deciding a Rule 29 motion,

> [w]hen, as now, a criminal defendant mounts a sufficiency challenge, all the evidence, direct and circumstantial, is to be viewed from the government's coign of vantage. Thus, the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and, moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt.

*United States v. Olbres*, 61 F.3d 967, 970 (1st Cir. 1995).   Ackerly contends that the government's evidence of her guilt was "weak" and "circumstantial." Dkt # 608 at 6.   This is not a sufficiency of the evidence argument, but rather an argument addressed to the credibility of the evidence adduced by the government at trial, a matter for the jury and not the court to weigh. Moreover, "the criminal law does not place a special premium on direct

---

[6] As the government points out, should the court be mistaken about the property issue, the jury will also be presented with the alternative theories of honest services fraud and false billing which are independent of any proper definition of tangible or intangible property.   *See* Gov't's Resp. Dkt # 614.

evidence.   As a general matter, the prosecution's burden of proof can be satisfied by either direct or circumstantial evidence, or by any combination thereof." *United States v. O'Brien*, 14 F.3d 703, 706-707 (1st Cir. 1994).[7]

(2)   Reconsideration of the court's *Petrozziello* ruling

Ackerly asks the court to revisit its ruling admitting for substantive purposes the incriminating statements of her alleged coconspirators. A statement in furtherance of a conspiracy is admissible as an exception to the rule against hearsay if it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose."   *United States v. Flores-Rivera*, 56 F.3d 319, 330 (1st Cir. 1995), quoting *United States v. Fahey*, 769 F.2d 829, 839 (1st Cir. 1985); *see also* Fed. R. Evid. 801(d)(2)(E).   Admissibility is determined solely by the trial judge by a preponderance of the evidence standard. *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977). While Fed. R. Evid. 104(a) permits a judge to consider hearsay statements

---

[7] Ackerly's secondary argument, that a reasonable jury could not have found that she knew of the fraudulent scheme involving Zentmyer, is simply a repackaging of her objection to the circumstantial nature of much of the government's evidence.   It is simply not the case, as Ackerly contends, Dkt # 602 at 10, that the government was required to prove that she knew Brian Zentmyer by name (as opposed to "my guy at ISS").   Even were that the case, the jury could have reasonably inferred from the testimony of Lauren Haber and Betty Rivera that Ackerly had signed off on false client billings to cover "tickets for Brian," that she knew that Sedlak's contact at ISS was an identifiable person.

for their truth in making admissibility findings, there must be "*some* extrinsic proof of the declarant's involvement in the conspiracy," United *States v. Sepulveda*, 15 F.3d 1161, 1182 (1st Cir. 1993) (emphasis added), as well as "*some* corroborating evidence delineating the role of the defendant and the declarant in the conspiracy itself." *United States v. Piper*, 298 F.3d 47, 52 (1st Cir. 2002) (emphasis added). Ackerly does not challenge the existence of the conspiracy or that the coconspirator declarants were members of that conspiracy, but rather she points to the supposed absence of evidence sufficient to establish that she has a criminal role in the illegal agreement and not merely "an unwitting one." Dkt # 608 at 9.

While the evidence of Ackerly's participation in the conspiracy fell short of the "cornucopia" adduced in *Piper*, it had enough heft and breadth to satisfy the *Petrozziello* preponderance of the evidence standard. Without cataloguing every detail, the testimony of Haber and Rivera regarding Ackerly's complicity in the false billing scheme and her interchanges with Sedlak seeking and accepting information from his ISS contact are sufficient to show at least "some" corroborating extrinsic evidence of her role.[8] It is true that Ackerly's role in the scheme was less dramatic in its intensity than

---

[8] The evidence is marshaled in its details in the Gov't's Resp. to Def.'s Post-Trial Motions. *See* Dkt # 514.

the parts played by her codefendants.   But the law does not distinguish between greater and lesser conspirators.   "Once a conspiracy is established, as well as defendant's intent to further it, any connection between the defendant and the conspiracy, even a slight one, will be sufficient to establish knowing participation."   *United States v. Brandon*, 17 F.3d 409, 428 (1st Cir. 1994).[9]

ORDER

For the foregoing reasons, the Motion for Judgment of Acquittal and/or to Reconsider the Ruling under *Petrozziello* are <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[9] I recognize, as Ackerly argues, that "[i]t is not inconsistent for a court to conclude, . . . based on its *own* inferences and credibility assessments, that it is more likely than not that no conspiracy existed, while, at the same time, concluding that the evidence, *viewed in the light most favorable to the government*, would permit a rational juror to find the defendant guilty beyond a reasonable doubt."   *United States v. Freeman*, 208 F.3d 332, 343 (1st Cir. 2000) (emphasis in original).   Here, I have no doubt as to the existence of the conspiracy or reason to question the credibility of witnesses like Haber who admired Ackerly as a mentor and friend and only reluctantly answered the summons to testify against her.